UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| MICHELLE D. BULLARD, | ) | |
| (Social Security No. XXX-XX-6063), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:09-cv-19-WGH-RLY |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 8, 10) and an Order of Reference entered by then-District Judge David Frank Hamilton on April 23, 2009 (Docket No. 14).

**I.  Statement of the Case**

Plaintiff, Michelle D. Bullard, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. § 404.1520(f).  This court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB and SSI on June 23, 2006, alleging disability since June 15, 2006.  (R. 53-55, 508-09).  The agency denied Plaintiff's application

both initially and on reconsideration.  (R. 39-40, 43-45, 510-15).  Plaintiff

appeared and testified at a hearing before Administrative Law Judge Albert

Velasquez ("ALJ") on September 24, 2007.  (R. 526-58).  Plaintiff was represented

by an attorney; also testifying was a vocational expert ("VE").  (R. 526).  On

February 8, 2008, the ALJ issued his opinion finding that Plaintiff was not

disabled because she retained the residual functional capacity ("RFC") to

perform a significant number of jobs in the regional economy.  (R. 10-21).  After

Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request,

leaving the ALJ's decision as the final decision of the Commissioner.  (R. 3-5).

20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on February

17, 2009, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 39 years old at the time of the ALJ's decision and had a high

school education.  (R. 20).  Her past relevant work experience included work as a

caterer (medium semi-skilled), medical assistant (medium semi-skilled), and

factory worker (light unskilled).  (R. 26-27).

### B.  Medical Evidence

#### 1.  Plaintiff's Impairments

Well before her alleged onset date, on July 29, 2004, Plaintiff visited a

rheumatologist, Apostolos E. Kalovidouris, M.D.  (R. 770-71).  Plaintiff had

complaints of achiness in her neck, back, shoulders, hips and knees, as well as

-2-

depression and difficulty sleeping.  (R. 770).  An exam showed normal muscle strength, normal reflexes, and no swelling of the joints; however, there was tenderness in numerous different pressure points.  (R. 771).  Dr. Kalovidouris diagnosed fibromyalgia.  (R. 771).  He advised that Plaintiff lose weight.  He also opined that Plaintiff could work but should avoid prolonged sitting or standing. (R. 771).

Plaintiff saw her treating physician, Daniel A. Walters, M.D., on June 15, 2006.  (R. 312-13).  Dr Walters noted a history of depression and obsessive compulsive disorder ("OCD").  It was noted that Plaintiff was losing her Medicaid coverage, and she was unable to afford insurance.  (R. 312).  Dr. Walters had noted depression in a prior visit on May 10, 2006.  (R. 317).

Jon W. Holdread, M.D., documents on June 19, 2006, a diagnosis of dysthymia referring to chronic depression with vacillating levels of depression. (R. 336).  Dr. Holdread noted that Plaintiff was feeling draggy, down, and unenergetic, and he noted that Plaintiff had symptoms of "low grade" depression. Plaintiff did not have suicidal thoughts or psychotic symptoms.  (R. 336).  Notes from previous visits to Dr. Holdread dating back to June 7, 2005, also document depression, anxiety, irritability, and lack of activity.  (R. 337-44).

On June 21, 2006, Plaintiff visited the Schneck Medical Center Emergency Department after a syncopal/heat exhaustion related incident.  (R. 131-43).  Plaintiff had been seen at the same emergency room on June 16 with complaints of a migraine.  (R. 145-56).

Plaintiff saw Dr. Walters on June 26, 2006.  (R. 308-09).  Dr. Walters noted the heat exhaustion incident (R. 308) and also indicated that Plaintiff suffered from depression and an acute myofascial sprain of the lumbar region (R. 309).  Major depression, OCD, a personality disorder, and fibromyalgia were noted by Dr. Walters on June 30, 2006.  (R. 651-52).  On that date, Dr. Walters noted that Plaintiff was "unable to work."  (R. 652).  On several visits, including August 22, 2006 (R. 644-45), September 8, 2006 (R. 639-40), and December 12, 2006 (R. 627-28), Dr. Walters has indicated that Plaintiff suffers from fatigue, which is a symptom of fibromyalgia.

On July 31, 2006, Plaintiff underwent a consultative examination by J. Theodore Brown, Jr., Ph.D., of the Indiana Department of Family and Social Services Disability Determination Bureau.  (R. 345-48).  Dr. Brown noted three hospitalizations for depression but indicated that the dates were unspecified.  (R. 345).  Plaintiff denied a history of drug or alcohol abuse.  (R. 346).  Plaintiff reported crying spells, mood swings, and forgetfulness.  (R. 346).  Testing of Plaintiff showed that she was oriented, had average cognitive/intellectual functioning, had an appropriate fund of information, had fair insight, and had good judgment and memory.  (R. 346-47).  Dr. Brown noted that Plaintiff drove, had friends, had relationships with her family that were not good, spent her days taking care of her kids, and watching TV, and had help from her mother with finances and her daughter with chores around the house and shopping.  (R. 347).  Dr. Brown diagnosed depression NOS, rule out cognitive disorder NOS,

anxiety disorder NOS, and pain disorder associated with a general medical condition.  Additionally, he noted, on Axis II, obsessive compulsive disorder and rule out borderline personality disorder.  (R. 348).  He also found a GAF score of 55-60 and opined that Plaintiff could not manage her own funds due to limited intellectual ability and problems with concentration.  Dr. Brown noted that the results of the examination appeared consistent with Plaintiff's allegations.  (R. 348).

On August 19, 2006, Plaintiff underwent an examination by Pamela Middleton, M.D., from Indiana Disability Determination Services.  (R. 374-77). Plaintiff reported chest pain and palpitations with panic attacks as well as some edema.  (R. 375).  Plaintiff had a normal gait and grip strength, as well as relatively normal range of motion in her joints except for some limitation in her left hip and normal straight leg testing except for some minimal pain in her back.  (R. 376).  The exam documented diagnoses of anxiety, depression, and OCD, along with fibromyalgia.  Dr. Middleton opined that "I would not consider her fibromyalgia to be a cause of impairment but rather a result of it.  [W]ith treatment of her psychological disorders, her fibromyalgia will probably be more manageable and not disabling."  (R. 377).

On September 5, 2006, Plaintiff was admitted to the Columbus Regional Hospital complaining of lightheadedness, palpitations, and diaphoresis.  (R. 402-03).  She reported recently being discharged from the Schneck Medical Center

where she had developed sepsis related to pneumonia.  (R. 402).  All tests were essentially normal.

On September 29, 2006, Dr. Holdread documented an anxiety disorder. (R. 387).  Dr. Holdread had noted Plaintiff's depression in an earlier visit on July 13, 2006, and opined that Plaintiff "needs to utilize therapy and not rely or expect a medication to change everything."  (R. 388).

Plaintiff was treated at Dr. Jill Christopher & Associates from September 2005 to October 2006.  (R. 432-46).  A therapist opined that Plaintiff's mental impairments would result in interruption of general communication in the workplace, poor boundaries and unhealthy decisions, along with distorted thoughts in most verbal situations.  (R. 431).  On September 18, 2006, documentation indicated Plaintiff had low average intelligence, borderline personality disorder, obsessive compulsive disorder, and a GAF of 41 current, 42 high past year.[1]  (R. 440).

On November 20, 2006, Plaintiff underwent a consultative exam from Larissa Dimitrov, M.D., who found very little limitations in Plaintiff's work-related abilities.  (R. 496-500).  Plaintiff had no edema, normal gait, normal grip strength, normal manipulative skills, normal range of motion in all areas except the lumbar spine, and a normal straight leg test.  (R. 497-98).  There were no signs of depression or any of the required tender points for a diagnosis of

---

[1]A GAF score ranging from 41-50 is indicative of serious problems in social or occupational functioning.

fibromyalgia.  Dr. Dimitrov opined that Plaintiff could do all work-related physical activities and had sustained concentration, persistence, and social interaction.  (R. 498).

A mental status examination on December 4, 2006, was performed by Jill A. Christopher, Psy.D.  (R. 501-05).  Plaintiff reported that she has OCD and "did everything twice," has depression and feels "sluggish."  (R. 501).  The mental status exam revealed adequate memory, proverb interpretation, and Plaintiff was oriented.  (R. 502-03).  Dr. Christopher reported a current GAF of 50, with 50 as the high for the past year.  (R. 501).  As noted, this score suggests an individual with serious vocational impairments.

Plaintiff was hospitalized from February 1-6, 2007, with symptoms of depression.  (R. 565-77).  She reported crying and suffering from increased stressors.  (R. 567).  She reported trying to cut herself with a knife.  (R. 569).  The medical records indicate that Plaintiff had been previously hospitalized for depression.  (R. 569).  She was diagnosed with major depression (chronic, moderate), OCD, and bipolar disorder.  (R. 571).

On March 19, 2007, Dr. Walters noted that Plaintiff's depression was "much improved."  (R. 618).  Dr. Walters noted depression and a mood disorder on March 13, 2007, but he explained that Plaintiff was "doing very well" and "feels great."  (R. 620-21).

On June 4, 2007, physical therapy notes indicate that Plaintiff skipped her session in order to travel to Florida with her father to get a van.  (R. 809).  Notes

from the previous visit had revealed that Plaintiff was feeling much better and that her muscle spasms had decreased.  (R. 809).

On June 23, 2007, Plaintiff visited the Schneck Medical Center emergency room after ingesting 25 Advil pills in 45 minutes.  (R. 667-78).  When asked why she took so many Advil, Plaintiff replied, "I'm fucked up."  And, when asked if she was trying to harm herself, Plaintiff replied, "I don't know."  (R. 667).  The impression was an intentional overdose.  (R. 671).  On June 24, 2007, Dr. Walters recommended Plaintiff's discharge and diagnosed overdose with Advil, chronic major depression, history of bipolar disorder, history of OCD, and an underlying personality disorder.  (R. 679-81).  Dr. Walters indicated that the overdose was a result of a building stressful situation with her parents and a headache that would not resolve.  (R. 679).

On July 5, 2007, Dr. Walters noted clinical impressions including depression and OCD.  (R. 595-96).  This was consistent with later consultations with Dr. Walters including August 6, 2007 (R. 601-02), August 9, 2007 (R. 599-600), and August 28, 2007 (R. 597-98).

On August 7, 2007, Scott Phillips, LCSW, LMFT, submitted a report detailing Plaintiff's condition.  (R. 814-15).  Phillips referenced a "history of 4 or 5 psychiatric acute hospitalizations."[2]  (R. 814).  He noted that her most recent psychiatric hospitalization was "January 4, 2007 at Columbus Regional

---

[2]This is consistent with Plaintiff's testimony at the administrative hearing where she testified to more than four such episodes.  (R. 536, 539).

Hospital." (R. 814). Her hospitalizations included a marked increase in depression and suicidal thoughts. Plaintiff reported depression that was increased because of a negative short-term romantic relationship, problems with a neighbor, conflict with her daughter's friends, and conflict with internet relationships. (R. 815). Phillips opined that "[w]hile she would appear to have the cognitive and social skills to find gainful employment, her impulsivity, mood variability, and difficulty with others would appear to call into question her ability to keep such a position." (R. 815).

Dr. Walters also completed, on August 20, 2007, a functional assessment form. (R. 589-94). He opined that Plaintiff could: stand and walk for less than two hours; sit for two hours; need an option to sit or stand at will; need to lie down to relieve physical symptoms; rarely twist, bend, stoop, crouch, squat, or climb; never push or pull or use her legs to operate foot controls or reach overhead; and have no heavy exposure to fumes, gases, dusts, or pollens. (R. 590-91). Plaintiff also had numerous mental deficits which would lead to extensive absences from work as well as difficulty with the ability to maintain attention, sustain an ordinary work routine, the ability to accept instruction/criticism, the ability to remember work procedures, and the ability to work with others or tolerate stress. (R. 593-94).

### 2. State Agency Review

On August 29, 2006, Joseph A. Pressner, Ph.D., a state agency psychologist, assessed Plaintiff's mental impairments. (R. 356-72). He found

Plaintiff was only mildly restricted in both her activities of daily living and in maintaining social functioning; he found she was moderately limited in maintaining concentration, persistence, and pace and had no episodes of decompensation of extended duration. (R. 366). Dr. Pressner concluded Plaintiff had no listing-level mental impairments. (R. 356-67). He assessed her RFC and noted that although Plaintiff may feel depressed, "she still is able to independently manage her household and care for her children. She has no problems relating to anyone." (R. 372). He also specifically considered Dr. Holdread's opinion that Plaintiff would have difficulty with interpersonal relations, and cited certain inconsistencies. (R. 372). Dr. Pressner concluded that Plaintiff retained the ability to perform simple, repetitive tasks on a sustained basis without special considerations. (R. 372). His opinion was affirmed by Dr. Ruiz and Dr. Shipley in December 2006. (R. 23, 506-08).

On September 8, 2006, J. Sands, M.D., a state agency physician, assessed Plaintiff's physical RFC, reflecting her primary diagnosis of fibromyalgia and secondary diagnosis of obesity. (R. 379-86). He reviewed the evidence of record and opined that Plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and was unlimited in her ability to push and/or pull with her extremities. (R. 380). Dr. Sands concluded that Plaintiff could occasionally climb ramps and stairs and never climb ladders, ropes or scaffolds; she could frequently crawl, crouch,

kneel, stoop, and balance, as well as climb ramps and stairs.  (R. 380).  He found no other limitations.  (R. 382-83).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date and that Plaintiff was insured for DIB through December 31, 2010. (R. 12). The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had seven impairments that are classified as severe: depression; r/o cognitive disorder; anxiety disorder; pain disorder associated with general medical condition; obsessive compulsive disorder; fibromyalgia; and obesity. (R. 12). The ALJ concluded that none of these impairments met or substantially equaled any of the listings in 20 C.F.R.

Part 404, Subpart P, Appendix 1. (R. 13). The ALJ determined that Plaintiff's testimony was not fully credible. (R. 17-19). The ALJ then found that Plaintiff retained the following RFC: lift and carry 20 pounds occasionally and ten pounds frequently; stand, walk, and sit for six hours in an eight-hour workday with a sit/stand option; occasionally climb stairs/ramps and balance; never climb ropes, ladders, or scaffolds; no operation of motor vehicles, or work at unprotected heights, around dangerous moving machinery, or around open flames or large bodies of water; only simple repetitive tasks; and no more than superficial contact with the public/co-workers/supervisors. (R. 14). The ALJ determined that, based on this RFC, Plaintiff could not perform her past work, but could still perform a significant number of jobs in the regional economy, including jobs as assembler, inspector, and hand packager. (R. 20-21). The ALJ, therefore, concluded that Plaintiff was not under a disability. (R. 21).

## VI. Issues

Plaintiff has raised six issues. The issues are as follows:

1. Whether the ALJ erred by failing to find Plaintiff's shoulder impairment severe.

2. Whether Plaintiff's mental impairments met a listing.

3. Whether the ALJ's credibility determination is patently wrong.

4. Whether the ALJ failed to give proper weight to the various medical opinions.

5.   Whether the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.

6.   Whether the ALJ improperly failed to take into consideration Plaintiff's award of Medicaid.

**Issue 1:    Whether the ALJ erred by failing to find Plaintiff's shoulder impairment severe.**

Plaintiff's first argument is that the ALJ should have found that her shoulder impairment was a severe impairment at step two of the five-step sequential evaluation process.  There was nothing improper about the ALJ's failure to label this impairment as a severe impairment.  As U.S. District Judge David Hamilton has indicated, "[a]s long as the ALJ proceeds beyond step two, as in this case, no reversible error could result solely from his failure to label a single impairment as 'severe.'  The ALJ's classification of an impairment as 'severe' or 'not severe' is largely irrelevant past step two.  What matters is that the ALJ considers the impact of all of the claimant's impairments–'severe' and 'not severe'–on her ability to work."  *Gordon v. Astrue,* 2007 WL 4150328 at *7 (S.D. Ind. 2007).  Here, because the ALJ proceeded beyond step two and analyzed Plaintiff's shoulder impairment in combination with all of Plaintiff's other impairments, his failure to label Plaintiff's shoulder impairment as a severe impairment was not an error that requires remand.

**Issue 2:    Whether Plaintiff's mental impairments met a listing.**

Plaintiff finds fault in the ALJ's determination that her mental impairments did not meet any of the mental impairment listings in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  Specifically, Plaintiff alleges that the ALJ

committed error by not concluding that Plaintiff's impairment met Listings

12.04, at a minimum, or 12.06 or 12.08.  In order to meet any of these three

listings, an individual must either meet the criteria of subsections A and B or the

criteria of subsection C of the listing.  Or, in the case of Listing 12.08 for

personality disorders, both the A and B criteria of the listing must be met.  *See*

20 C.F.R. Part 404, Subpart P, Appendix 1.  In this case, the focus is on whether

or not Plaintiff has demonstrated that her mental impairment is severe enough

that it meets the B criteria of the listings.  In order to meet the B criteria of any

of these three listings, Plaintiff must demonstrate:

> B. ... at least two of the following:
> 1.  Marked restriction of activities of daily living; or
> 2.  Marked difficulties in maintaining social functioning; or
> 3.  Marked difficulties in maintaining concentration, persistence, or pace; or
> 4.  Repeated episodes of decompensation, each of extended duration;
> . . . .

*Id.*  Furthermore, the 12.00 Listings explain that there is a specific meaning for

the phrase "episodes of decompensation:"

> 4.  *Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or

other relevant information in the record about the existence, severity, and duration of the episode.

The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Part 404, Subpart P, Appendix 1 (emphasis added).

In this case, the ALJ's rationale for finding that Plaintiff's mental impairments did not meet a listing was as follows:

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 or 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration; means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. Her mother reported on July 31, 2006 that the claimant went for walks, bathed and did light housework. She cared for her two children and took them places. She cooked for them and did their laundry. (Ex. 1E/32). The claimant reported she can drive. Her hobbies included reading, walking and swimming. (Ex. 1F/218).

In social functioning, the claimant has mild to moderate difficulties. The claimant testified that she does not get along with people and is paranoid. However, she reported on August 16, 2006 she does go out in the community because her kids are involved in various

activities.  She also went to church every Sunday but did not talk to anyone.  She has a friend that she visits twice a month.  (Report of Contact, 8/16/06).  Her mother reported she attends parent teacher conferences if necessary and talks over the phone with teachers. The claimant got along well with her children's friends and their parents.  If she saw someone in public, she would initiate conversation.  The claimant got along well with her parents and her brothers.  She went out to lunch occasionally with friends.  She interacted appropriately with medical professionals and was capable of calling the doctor to discuss medical concerns.  She did not respond well to criticism and would rant and rave for a short period of time.  However, the claimant reported that when she was screamed at by a customer, she would just apologize and "try to make it right".  (Ex. 1F/224).  The claimant also attended Weight Watcher's once a week.  (Ex. 1E/23).

With regard to concentration, persistence or pace, the claimant has moderate difficulties.  Her mother reported she remembers to take her medication and is responsible for scheduling medical appointments for herself and her children.  She remembered locations.  (Ex. 1E/22).  Her mother reported she was able to read, understand, and follow food preparation directions.  She enjoyed trying new recipes.  The claimant generally finished tasks that she started but at times would rely on her daughter to complete tasks. She read books and was able to understand what she read.  The claimant did have anxiety attacks but "not real often".  (Ex. 1E/25). During mental status examination on July 31, 2006, she could remember three of three objects immediately and after five minutes. She performed simple calculations but was unable to do serial 7's or 3's.  Her thought processes were coherent and goal directed.  (Ex. 1 F/218).  On December 4, 2006, her attention and activity were within normal limits.  She was oriented times three.  (Ex. 1F/372). She has alleged symptoms of OCD and anxiety which could interfere with concentration.  For that reason, I have restricted her to unskilled, simple repetitive work.

As for episodes of decompensation, I will allow the claimant one episode of decompensation based on her hospitalization of February 1, 2007.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated"

episodes of decompensation, the "paragraph B" criteria are not satisfied.

Insofar as the "C" criteria of the listings is concerned, the claimant has not had repeated episodes of decompensation.  In addition, the evidence does not establish that even a minimal increase in mental demands or changes in the environment would be predicted to cause her to decompensate.  Furthermore, she does not have an inability to function outside a highly supportive living environment or complete inability to function independently outside the area of her home.  Accordingly, the claimant's mental impairments do not meet or equal listings 12.04 or 12.06.

(R. 13-14).

The ALJ's analysis of whether or not Plaintiff's mental health impairments met any of the listings is problematic for two reasons.  First, the ALJ did not adequately address Plaintiff's episodes of decompensation.  The ALJ only credited Plaintiff with one episode of decompensation because of a hospital stay in February 2007.  However, there were several references to Plaintiff being hospitalized for depression on numerous occasions both prior to and after the February 2007 hospitalization.  On July 31, 2006, consultative examiner Dr. Brown noted three unspecified prior hospitalizations for depression.  (R. 345).  Additionally, the records from Plaintiff's February 2007 hospitalization indicate prior hospitalizations for depression.  (R. 565-77).  Plaintiff was also hospitalized on June 23, 2007, with an apparent suicide attempt.  (R. 667-78).  Finally, in August 2007, Social Worker Scott Phillips referenced a "history of 4 or 5 psychiatric acute hospitalizations."  (R. 814).  He also noted a psychiatric hospitalization on "January 4, 2007 at Columbus Regional Hospital."  (R. 814).

While the ALJ was certainly not obligated to conclude that Plaintiff demonstrated the requisite number of episodes of decompensation to meet any of the 12.00 mental impairment listings, the ALJ must, at minimum, discuss all of Plaintiff's hospitalizations and explain whether or not they amounted to an episode of decompensation.  There is, at least, some evidence in the record that Plaintiff experienced three episodes of decompensation in the first six months of 2007.  If the ALJ were to have credited each of these hospitalizations as episodes of decompensation, Plaintiff could have met Listing 12.04.  Without a discussion of all of the medical records that referenced Plaintiff's hospitalizations, the Magistrate Judge cannot trace the path of the ALJ's reasoning.

Second, the ALJ cites to several sources for the proposition that Plaintiff has not experienced the "marked" limitations necessary to meet any of the 12.00 Listings.  Absent, however, from the ALJ's analysis are several pieces of medical evidence.  Social Worker Phillips opined that "[w]hile [Plaintiff] would appear to have the cognitive and social skills to find gainful employment, her impulsivity, mood variability, and difficulty with others would appear to call into question her ability to keep such a position."  (R. 815).  Also, the ALJ references opinions from Dr. Jill Christopher and Associates, but failed to reference the opinion that Plaintiff's mental impairments would result in interruption of general communication in the workplace, poor boundaries and unhealthy decisions, along with distorted thoughts in most verbal situations.  (R. 431).  Additionally, the ALJ does not address the opinion of Dr. Brown that Plaintiff could not

manage her own funds due to limited intellectual ability and problems with concentration.  (R. 348).  While there is some evidence that Plaintiff's mental impairments do not result in the "marked" limitations necessary to meet a listing, the ALJ, on remand, should address both favorable and unfavorable evidence.

**Issue 3:**      **Whether the ALJ's credibility determination is patently wrong.**

Plaintiff also argues that the ALJ conducted a flawed analysis of her credibility.  An ALJ's credibility determination will not be overturned unless it is "patently wrong."  *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000).  However, here the ALJ's "credibility" decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain.  Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms.  The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms.  If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.*  This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4).  These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added).  SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant including:  (1) the individual's daily activities; (2) the location, duration,

-21-

frequency, and intensity of the individual's pain or other symptoms; (3) factors

that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness,

and side effects of any medication the individual takes or has taken to alleviate

pain or other symptoms; (5) treatment, other than medication, the individual

receives or has received for relief of pain or other symptoms; (6) any measures

other than treatment the individual uses or has used to relieve pain or other

symptoms; and (7) any other factors concerning the individual's functional

limitations and restrictions due to pain or other symptoms.  20 C.F.R. §

404.1529(c)(3)(i)-(vii).

In this case, the ALJ examined Plaintiff's credibility during a rather

lengthy discussion at pages 15-19 of the Record.  The ALJ thoroughly examined

each of the seven factors discussed in 20 C.F.R. § 404.1529(c)(3).  The ALJ

reasonably determined that Plaintiff's activities of daily living, as well as the lack

of significant treatment and the lack of use of pain medication for her

fibromyalgia, were inconsistent with her complaints of debilitating symptoms.

The ALJ reasonably credited Plaintiff's testimony about her aversion to being

around people and limited her to no more than superficial contact with the

public/co-workers/supervisors.  The ALJ also reasonably accommodated her

lack of concentration by limiting her to simple repetitive tasks.  And, the ALJ

credited Plaintiff's testimony about the side effects of her medication by

excluding jobs that involved unprotected heights or dangerous machinery.  This

was a perfectly reasonable credibility determination conducted by the ALJ, and

the Magistrate Judge cannot say that it was "patently wrong."  Therefore, the

credibility determination will not be disturbed.

**Issue 4:**     **Whether the ALJ failed to give proper weight to the various**
**medical opinions.**

Next, Plaintiff argues that the ALJ failed to give controlling weight to the

opinions of her treating physicians and gave too much weight to nonexamining

state agency physicians.  Opinions of a treating physician are generally entitled

to controlling weight.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).

However, an ALJ may reject the opinion of a treating physician if it is based on a

claimant's exaggerated subjective allegations, is internally inconsistent, or is

inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270

F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides

guidance for how the opinions of treating and nontreating sources are to be

evaluated and explains as follows:

> (d)  *How we weigh medical opinions.*  Regardless of its source,
> we will evaluate every medical opinion we receive.  Unless we give a
> treating source's opinion controlling weight under paragraph (d)(2) of
> this section, we consider all of the following factors in deciding the
> weight we give to any medical opinion.

> (1)  *Examining relationship.*  Generally, we give more weight to
> the opinion of a source who has examined you than to the opinion of
> a source who has not examined you.

> (2)  *Treatment relationship.*  Generally, we give more weight to
> opinions from your treating sources, since these sources are likely to
> be the medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may bring a
> unique perspective to the medical evidence that cannot be obtained
> from the objective medical findings alone or from reports of
> individual examinations, such as consultative examinations or brief

hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  *Nature and extent of the treatment relationship.*  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3)  *Supportability.*  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their

opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)  *Consistency.*  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5)  *Specialization.*  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)  *Other factors.*  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

*****

(f)  *Opinions of nonexamining sources.*  We consider all evidence from nonexamining sources to be opinion evidence.  When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section.  In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

(1)  In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this

> subpart, and your residual functional capacity.  These
> administrative findings of fact are based on the evidence in your
> case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

The ALJ, in this case, examined the opinion evidence with the following

discussion:

> As for the opinion evidence, her treating psychiatrist, Dr. Jon W.
> Holdread, reported the claimant has difficulty with interpersonal
> relationships and an inability to handle stress appropriately.  Yet,
> the claimant's reaction to her supervisor and an upset customer
> does not support his assessment.  (Ex. IF/224).  Even so, my
> limitation to simple, repetitive work and superficial contact with the
> public adequately addresses his assessment.
>
> I have also considered the opinion of treating physician, Dr. Daniel
> Walters dated August 20, 2007.  (Ex. B3).  Dr. Walters indicated the
> claimant could lift/carry 10 pounds occasionally and 5 pounds
> frequently.  She could stand and walk less than two hours and sit
> about two hours.  She had to lie down 4 hours out of an 8 hours
> [sic] day.  He bases his conclusion on a diagnosis of fibromyalgia.
> However, the claimant's rheumatologist (the appropriate specialist
> for fibromyalgia – *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir. 1996)
> did not indicate such severe restrictions were warranted.  In fact, he
> advised her to return to work and perform a job where she could sit
> and stand intermittently.  (Ex. B185).  In addition, treatment records
> from Dr. Walters do not support such limitations.  His records
> generally indicate her physical examination was within normal
> limits.  (Ex. B47, B50, B57, B65).  In addition, as noted above, the
> claimant was able to take a vacation in June 2007 and travel to
> Florida to get a van.  (Ex. C34).  To be as limited as he alleges, one
> would expect ongoing treatment with a rheumatologist.  However,
> that is not the case in this record.  Overall, the evidence does not
> support the physical limitations he alleges.  His opinion regarding
> her mental functioning is outside his area of expertise.  Accordingly,
> his opinion is not entitled to controlling weight.
>
> I have given considerable weight [to] the opinions of the State agency
> medical consultant.  (Ex. 1F251).  Overall, I find their opinions are
> well-supported by the objective medical evidence of record.  Thus, I

have assessed a residual functional capacity for the claimant which is largely consistent with their opinions.

As for the claimant's mental impairment, the residual functional capacity I have assessed is consistent with the opinion of Dr. Joseph A. Pressner, Ph.D., a state agency medical consultant (Ex. 1F/241-243).  Dr. Pressner opined the claimant is moderately limited in her ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  She was also moderately limited in her ability to maintain attention and concentration for extended periods.  She was found capable of performing simple repetitive tasks on a sustained basis without special considerations.  I find Dr. Pressner's opinion is well supported by the evidence of record regarding the claimant's mental impairments.  Therefore, I have considered this opinion in assessing the claimant's residual functional capacity by limiting her to only simple and repetitive tasks.

(R. 19-20).

The Magistrate Judge concludes that the ALJ's explanation for the weight given to these various pieces of opinion evidence is flawed.  First, the ALJ gave considerable weight to the opinions of Dr. Pressner.  However, Dr. Pressner's evaluation of Plaintiff's mental health record indicates no episodes of decompensation and was conducted in 2006, well before the hospitalizations in 2007.  Therefore, it is not consistent with other medical evidence in the record and should not have been so heavily relied upon.

Second, the ALJ failed to give controlling weight to the opinions of Dr. Walters because the ALJ believed that Dr. Walters' opinions regarding Plaintiff's mental health were outside Dr. Walters' area of expertise.  Dr. Walters had opined on August 20, 2007, that Plaintiff would have difficulty with the ability to

maintain attention, sustain an ordinary work routine, the ability to accept instruction/criticism, the ability to remember work procedures, and the ability to work with others or tolerate stress.  (R. 589-94).  The fact that Dr. Walters is not a psychologist did not warrant the ALJ's unfavorable treatment of his mental health opinions.  The Magistrate Judge also notes that Dr. Walters' opinion was consistent with the opinions discussed above of Social Worker Phillips (R. 815) and the evaluation from Dr. Jill Christopher and Associates (R. 431).  The ALJ's failure to discuss all evidence consistent with Dr. Walters' opinions, as well as the improper weight given to the opinions of Dr. Pressner, a state agency psychologist, requires remand.

**Issue 5:     Whether the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.**

Additionally, Plaintiff finds fault in the ALJ's assessment of Plaintiff's RFC. The Magistrate Judge concludes that the ALJ's RFC assessment concerning Plaintiff's physical limitations is well supported by the evidence of record. However, for the reasons discussed above, the ALJ must conduct a new assessment of Plaintiff's mental RFC after re-evaluating whether Plaintiff meets one of the listings under 12.00, and after re-examining the opinion evidence.

**Issue 6:     Whether the ALJ improperly failed to take into consideration Plaintiff's award of Medicaid.**

Finally, Plaintiff argues that the ALJ erred when he failed to give significant weight to a decision that granted her Medicaid benefits.  As the

Seventh Circuit has explained, "[d]eterminations of disability by other agencies do not bind the Social Security Administration . . . ." *Allord v. Barnhart,* 455 F.3d 818, 820 (7th Cir. 2006).  Nevertheless, Social Security Ruling 06-03p provides that even though the SSA is not bound by the disability determinations of other government agencies, "the adjudicator should explain the consideration given to these decisions in the notice of the decision for hearing cases."  SSR 06-03p.

The ALJ, in this case, did not make mention of any Medicaid decision. Plaintiff did testify at the hearing before the ALJ that she was receiving Medicaid benefits.  (R. 542).  However, notes from June 15, 2006, the very date that Plaintiff alleges was her onset of disability, indicate that she was losing her Medicaid benefits.  (R. 312).  The Magistrate Judge has also been unable to discover within the administrative record an actual decision granting Medicaid benefits during the time frame at issue in this decision.  The lack of objective evidence of a Medicaid decision leads the Magistrate Judge to conclude that the ALJ did not err by failing to address Plaintiff's alleged receipt of Medicaid benefits.

## VII.  Conclusion

The ALJ's decision is supported by substantial evidence in many respects. However, the ALJ must re-examine whether Plaintiff's mental impairments meet a listing.  Additionally, the ALJ must re-weigh the opinions of the treating and

examining sources.  The decision of the Commissioner of the Social Security

Administration is **REMANDED** for further proceedings.

     **SO ORDERED** this 26th day of February, 2010.

_____
William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Steven K. Robison
MONTGOMERY ELSNER & PARDIECK
srobison@meplegal.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov